IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

LA'MONT WALKER,

                           Plaintiff,

   v.                                                          OPINION and ORDER

BURTON COX, SONYA ANDERSON,
ANGELA MCLEAN, KELSEY LUND, BETH EDGE,         15-cv-293-jdp
MICHAEL SHERMAN, GARY BOUGHTON, and
JOLINDA WATERMAN,

                           Defendants.

---

Plaintiff La'Mont Walker is proceeding in this case on claims that prison officials at the Wisconsin Secure Program Facility failed to provide him with treatment for a bacterial infection and ongoing digestive problems, subjected him to unsanitary conditions that plaintiff believes caused the infection, and failed to provide him with adequate nutrition in light of his stomach problems. Before the court are the parties' cross motions for summary judgment. Dkt. 84 and Dkt. 97. Because no reasonable jury could conclude from the evidence in the record that any of the defendants violated Walker's Eighth Amendment rights, I am denying Walker's motion and granting defendants' motion.

UNDISPUTED FACTS

The following facts are drawn from the parties' summary judgment materials, and are undisputed unless noted otherwise.

A. **The parties**

At all times relevant to this case, Walker was confined at Wisconsin Secure Program Facility (WSPF). All defendants worked at WSPF during the relevant time period: Burton Cox

was a physician; Jolinda Waterman was the health services manager; Sonya Anderson, Beth Edge, Kelsey Lund, and Angela McLean were nurses; Michael Sherman was a correctional sergeant; and Gary Boughton was the warden.

**B. Medical treatment for Walker's H. pylori infection, digestive problems, and reflux**

Sometime in 2011 after he was transferred to WSPF, Walker started experiencing severe stomach pain, vomiting, and other digestive problems. (The record does not include information about any treatment Walker sought or received for his stomach problems between 2011 and 2014. Defendant Lund saw Walker once during 2013 when she conducted an EKG test on him.)

   1. **2014 interactions with McLean, Anderson, and Cox**

In October 2014, Walker attempted to talk with defendant McLean about his stomach problems while she was conducting wellness checks on Walker's unit. McLean did not respond to Walker right away, so Walker began yelling. McLean was aware at the time that Walker had been experiencing ongoing stomach problems. Under prison policy, inmates are supposed to submit health service requests to obtain medical treatment for non-emergencies. McLean approached Walker's cell and told him to submit a health service request about his stomach pain. (Walker says that McLean was hostile and angry and told him that he did not need immediate medical attention because he was "standing [and] breathing." McLean denies saying this to Walker.) McLean then continued performing wellness checks on other inmates. Walker submitted a health service request and was seen by a doctor a few days later.

Approximately one week after his interaction with McLean, Walker called to defendant Anderson while she was conducting wellness checks on the unit. Walker asked Anderson why she was not checking on his medical problems. Anderson told Walker to submit a health service

2

request. (Walker says that Anderson also said, "Don't cry to me. You're not at the Hilton Hotel." Anderson denies saying this to Walker.)

In December 2014, Walker saw defendant Dr. Cox with complaints of pain in the epigastric region of his stomach, which is just below the breastbone. Cox suspected that Walker may be infected with helicobacter pylori (H. pylori), which is a common type of bacteria that infects the stomach. H. pylori may be passed from person to person through direct contact with saliva, vomit, or fecal matter, and may also be spread through contaminated food or water. H. pylori can be treated with antibiotics, but most people who have H. pylori in their bodies do not develop any symptoms from it. H. pylori can cause peptic ulcers and associated symptoms, including an ache or burning pain in the abdomen, nausea, loss of appetite, frequent burping, bloating, unintentional weight loss, and abdominal pain that is worse when the stomach is empty. Because Walker was experiencing some of these symptoms, Cox ordered an H. pylori blood-screen.

Walker tested positive for H. pylori. Doctors usually treat H. pylori with two varieties of antibiotics at once to prevent the bacteria from developing a resistance to one particular antibiotic. Doctors also generally prescribe an acid-suppressing drug, to help the stomach lining heal, such as a proton pump inhibitor, histamine blocker, or bismuth subsalicylate (Pepto-Bismol). Cox prescribed two antibiotics for Walker, Clarithromycin and Amoxicillin, and a proton pump inhibitor, omeprazole. Cox also sent Walker information about the H. pylori infection and the medications he was prescribing.

On December 23, 2014, Walker wrote to Cox that his medications were making him sick and causing abdominal pain. Cox responded that Walker's symptoms were likely side effects of the antibiotic Clarithromycin and he told Walker to take the medication with food.

3

Cox encouraged Walker to "Stick it out – it'll get better." On January 5, Cox directed health services staff to obtain a stool sample from Walker two weeks after he finished his omeprazole to determine whether the antibiotic treatment was successful.

**2. 2015 interactions with Cox, Sherman, and Edge**

On January 12, 2015, Cox increased Walker's prescription for omeprazole, prescribed Carafate, a medication used to treat and prevent ulcers, and ordered Pepto-Bismol for Walker's upset stomach. Cox scheduled a follow up for two weeks. According to Walker, he did not take all of the medications Cox ordered because the medications were making him feel worse.

On January 22, Walker saw Cox for a follow-up appointment. Walker was still having epigastric pain despite having received the full treatment for peptic ulcer disease. Walker told Cox that he was occasionally regurgitating his meals. Cox thought Walker might have a stomach ulcer or gastroesophageal reflux disease (GERD), so Cox ordered an ultrasound and an esophagogastroduodenoscopy (EGD) test to examine the lining of Walker's esophagus. Cox changed Walker's order for Pepto-Bismol tablets to Gaviscon tablets to treat possible GERD, and ordered a complete metabolic lab draw to check Walker's kidneys, liver, electrolytes, and inflammation markers.

The lab and the ultrasound results were normal. The ultrasound showed "unremarkable sonographic evaluation of the visualized right upper quadrant" and the lab results showed no evidence of anemia, gastrointestinal bleeding, or impaired kidney, liver, or pancreas function. Walker continued to complain of occasional nausea and vomiting after meals so, on February 9, Cox discontinued the prescription for Carafate and ordered that Walker continue taking omeprazole. On February 22, Walker submitted health service request complaining about

4

vomiting and pain in his abdominal area. Cox responded that Walker had a surgical consult scheduled.

On February 25, Walker was seen offsite by Dr. James Yurcek, a specialist in general surgery, to determine whether an EGD was appropriate. Yurcek concluded that an EGD would be appropriate, so Cox requested that the EGD be scheduled. In the interim, Cox responded to several health service requests Walker filed by modifying Walker's medications.

The EGD was performed on April 1, 2015. The EGD showed features of chronic reflux without "active inflammation" and "chronic superficial gastritis." Biopsy specimens were negative for H. pylori. Dr. Yurcek sent a note back to WSPF's health services unit stating that the EGD showed "no ulcers" and "no gastritis" and that Walker had been "biopsied to evaluate for microscopic disease." Dkt. 100-2 at 18. Cox ordered that Walker see Yurcek for a follow-up.

A couple of days later, on April 4, Walker was having difficulty eating and began vomiting his food. According to Walker, he pushed his cell intercom button and told defendant Sherman, a sergeant, that he was vomiting food and that his stomach hurt. Sherman responded that he would tell health services. Walker says that a few seconds later, a correctional officer came to Walker's cell to ask about his medical problem. Walker told the officer that he was vomiting blood and that his stomach hurt. The officer said "okay" and then left. According to Sherman, there is no record of Walker calling him on the intercom to complain on April 4, but if he had done so, Sherman would have asked an officer to assess Walker. If there was no emergency, Sherman would have told Walker to file a health service request. Walker did file a health service request on April 4 regarding his stomach pain.

On April 8, 2015, Walker was seen offsite by Dr. Yurcek. Yurcek diagnosed Walker with chronic gastritis and chronic reflux, but stated that "these results are unlikely to explain ongoing abdominal pain." Yurcek recommended an ultrasound to check Walker's gallbladder, and if that was negative, Yurcek recommended a hepatobiliary (HIDA) scan to check for problems in the liver, gallbladder, and bile ducts. Because the January 2015 ultrasound had not shown gallbladder stones, Cox ordered the HIDA scan. Also on April 8, Cox changed Walker's order for Maalox to Mintox Plus tablets to see if it would work any better for him.

On April 10, Walker saw defendant Waterman with complaints of stomach pain, ineffective medication, and vomiting with blood. Waterman believed that Walker was suffering from GERD and perhaps a recreational injury. She told him it was important to take omeprazole, but Walker said that he was not taking it because it made him sick.

On April 15, Walker submitted a health service request complaining about pain and a burning sensation in the navel area of his stomach. Cox responded that he had ordered a HIDA scan to check Walker's gallbladder function, and that his EGD, abdominal ultrasound, and labs were "all ok." Cox instructed Walker to continue taking omeprazole in the meantime. Cox then checked with health services staff about whether the HIDA scan had been scheduled for Walker.

On April 23, Cox met with Walker again. Cox noted that until the HIDA scan was performed, he would give Walker the maximum omeprazole with Ranitidine medication therapy for GERD and gastritis. Cox also noted that if the HIDA scan was negative, then through "diagnosis by exclusion," Walker may have "functional/abdominal pain," meaning an ongoing presence of abdominal pain for which there is no known medical explanation. Cox suggested that low-dose antidepressants could be helpful for this, but he did not prescribe

6

antidepressants at that time. Walker received the HIDA scan on May 12. The report noted a normal functioning gallbladder.

On May 16, Walker submitted a health service request complaining that his stomach hurt and felt like it was burning. Cox ordered that Walker's prescription for omeprazole be changed to Pantoprazole to see if a different proton pump inhibitor would help. On May 25, Walker complained again about stomach pain. Cox responded, stating that Walker was on the maximum medications and that the EGD and biopsy findings did not explain his reported symptoms. Cox told Walker to let him know if the Pantoprazole was no better than omeprazole had been because there was one more medication that he could try. Walker submitted another health service request on May 31, stating that he was "constantly regurgitating" his food and having "gnawing pain" in his stomach due to irritation from the "chronic inflammation and chronic gastritis." Cox responded on June 1, stating that Walker's H. pylori was gone, the EGD showed that there was no "active inflammation" in his esophagus, and the biopsy results did not explain his ongoing abdominal pain. (Cox left WSPF in July 2015 and has not treated Walker since then.)

On August 8, Walker submitted a health service request complaining about "excruciating pain" and requesting an H. pylori test. Defendant Waterman ordered the test, which was negative.

On September 20, Walker submitted another health service request complaining about stomach pain. Defendant Edge assessed him. She noted that he had discomfort around his naval. Walker declined Edge's offer of Rulox tablets. Edge told Walker to increase his water consumption. She also put Walker on the list to be seen by a physician. (Walker says that Edge

7

also told him to stop doing sit-ups to avoid irritating his stomach and said, "I do not know what else to tell you," before walking away. Edge denies saying this to Walker.)

On September 30, 2015, Walker was seen by an institution doctor. The doctor assessed Walker with gastritis and referred Walker to Dr. Yurcek. When Walker saw Yurcek in November 2015, Yurcek recommended another EGD to look for exacerbation of gastritis and to check for duodenitis, which is swelling in upper segment of the small intestine.

### 3. 2016 treatment by Waterman

On January 6, 2016, Walker was seen by Dr. Yurcek for an offsite appointment for the EGD. Yurcek noted inflammation at the ampulla, chronic gastritis, and reflux and ordered biopsies from several areas. Yurcek recommended that Walker take omeprazole every day for one year. Walker continued to file health service requests complaining about vomiting and stomach pain. Health services staff responded that Walker should take the omeprazole. Walker saw Yurcek again on January 13 for an offsite appointment, and Yurcek recommended that Walker take Nexium, Carafate, and omeprazole.

On January 28, Walker submitted a health service request complaining about stomach pain and stating that his medications made his stomach hurt. Defendant Waterman responded on January 29 by summarizing the treatment that Walker had received and stating the Walker needed to stick with his medications if he wanted to get better.

In June 2016, Walker was referred by an outside provider for an "esophageal manometry," which is a test used to identify problems with movement and pressure in the esophagus. The results showed "normal esophageal manometry." In July 2016, Walker was seen by another outside gastroenterology doctor for "esophageal impedance-PH monitoring," to evaluate the amount of reflux in his esophagus. The results were consistent with a

8

"hypersensitive esophagus." The outside doctor thought that Walker's symptoms might be due to gastroesophageal reflux and that he might respond to anti-reflux therapy. By this time, several of Walker's medications, including reflux medications, had been discontinued because he was not taking them.

**C. Walker's requests for a special diet**

Between January and April 2016, Walker made multiple requests to the health services unit that he be placed on a restricted diet to improve his stomach problems. Under DOC policy, medical diets must be ordered by an advanced care provider (a doctor or nurse practitioner) and approved by the DOC medical director and dietician. DOC offers a "no citrus" diet, which excludes tomato, orange, pineapple, fruit cocktail, and tropical fruit. The WSPF "no citrus" menu substitutes these items with non-citrus fruits. Although DOC used to provide a "bland diet" for those with specific medical needs, it discontinued the "bland diet" option. Now if an inmate needs a bland diet, they are directed to avoid eating spicy foods and any other food that triggers discomfort, such as black pepper, chili powder, caffeine, coffee, decaffeinated coffee, tea, and cocoa. Inmates have access to nutritional information about caloric intake of the various food items provided so that they can see how many calories they are ingesting and not ingesting by selecting only bland foods.

Defendant Anderson forwarded one of Walker's requests concerning a special diet, dated February 26, 2016, to a doctor. (There is nothing in the record explaining how the doctor responded to Walker's request.) Otherwise, defendants Waterman and Anderson and other medical staff responded to Walker's requests by stating that the "bland diet" was no longer available in DOC prisons, that he should self-select his food to avoid foods triggering his symptoms, and that he would need to ask a doctor at his next appointments about a special

9

diet. At one point, Waterman noted that Walker was gaining weight, and she suggested that he try "acidophilus with pectin" and lactaid tablets to assist with his stomach pain.

On July 14, 2016, Dr. Syed wrote an order for Walker for a bland diet with no citrus or spicy foods. On August 2, Nurse Practitioner Bonson also ordered a "no citrus diet" for Walker and gave him a vitamin C supplement. Three days later, on August 5, Bonson wrote a progress report note stating that the "no citrus" diet was being discontinued at Walker's request. (Walker says he never asked Bonson or anyone else to discontinue the "no citrus" diet.)

After Waterman and food services told Walker that the special diet had been discontinued, Walker contacted health services to clarify that he had not requested that the diet be discontinued. On August 25, a doctor reinstated Walker's "no spicy food" and "no citrus" diet. (Walker says that sometimes he receives spicy or citrus foods with his meals despite being approved for the special diet, but he provides no specific details about how often this happens, why he cannot simply choose not to eat those items, or why he thinks that avoiding those items results in his not ingesting sufficient calories or nutrition.)

Walker's weight has increased since 2014. In April 2014, Walker weighed 196 pounds. In May 2016, Walker weighed 225 pounds. He gained approximately eight pounds during 2016.

D. Process for cleaning cells

Once a week, segregation inmates are given an opportunity to clean their cells with a rag soaked in cleaning solution, a dry rag, a toilet brush, and a mop. The toilet brushes, wet rags, and mops are kept in separate pails of Virex cleaning solution. (Although Walker says that the rags and brushes are kept in the same bucket, he does not say why he thinks this. For

10

example, he does not say that he has seen officers putting clean rags into the same pail that the toilet brushes are kept in. He also does not say that he has received a cleaning rag that appeared to be contaminated.) The cleaning supplies are provided to the inmates through the lower trap in their cell. The inmates use the same toilet brushes and mops, but each inmate gets fresh cleaning rags. When the inmate is finished with the toilet brush, the toilet brush is placed back into the bucket of Virex and stays in the bucket for at least five minutes before being given to another inmate. The used rags are placed in the dirty laundry and are not reused until they have been washed.

ANALYSIS

Walker is proceeding on claims under the Eighth Amendment that (1) defendants Edge, Lund, Anderson, McLean, Sherman, and Cox were deliberately indifferent to his serious medical needs; (2) defendants Waterman and Anderson were deliberately indifferent to his nutritional needs; and (3) defendants Boughton was deliberately indifferent to unsanitary cell conditions. I will consider each claim in turn.

A. **Walker's medical treatment**

The Eighth Amendment imposes a duty on prison officials to take reasonable measures to guarantee an inmate's safety and to ensure that inmates receive adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). A prison official's "deliberate indifference" to a prisoner's medical needs or to a substantial risk of serious harm violates the Eighth Amendment. *Id.* at 828; *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). To survive summary judgment, Walker must present evidence suggesting that he suffered from an objectively serious medical condition and that the defendants knew about the condition but disregarded it by

failing to take reasonable measures to address it. *Farmer*, 511 U.S. at 834; *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015).

Walker has presented evidence sufficient to suggest that his H. pylori infection and chronic stomach pain, vomiting, and reflux were objectively serious medication conditions. *See, e.g., Rowe v. Gibson*, 798 F.3d 622, 627 (7th Cir. 2015) (GERD may present serious medical condition); *Miller v. Campanella*, 794 F.3d 878, 880 (7th Cir. 2015) (same). This leaves the question whether defendants knew about Walker's serious medical needs but failed to properly treat them and instead, knowingly disregarded "'an excessive risk to [his] health or safety.'" *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (quoting *Farmer*, 511 U.S. at 837). Walker has not made this showing with respect to any of the defendants.

Defendants Edge, Lund, Anderson, and McLean were nurses who responded to Walker's requests for care on various occasions. Walker alleges that at different times, Lund, Edge, Anderson, and McLean ignored his requests for care even after he told them he was in pain and vomiting. But he has not submitted evidence to support this allegation. As for Lund, Walker submitted no evidence that Lund ever treated him for his stomach or reflux problems. In contrast, defendants' evidence shows that Lund saw Walker only once during her employment at WSPF, when she completed an EKG test on Walker in 2013. Lund states that if Walker had reported stomach problems to her, she would have directed him to file a health service request to seek an appointment with a physician. Walker has submitted nothing to contradict Lund's statement.

As for the other nurses, the undisputed evidence shows that on each occasion that they interacted with Walker, they assessed him, determined that he was complaining about his ongoing digestive and reflux problems, and instructed him to file a health service request so

12

that he could be scheduled to be seen by the physician who was monitoring his treatment. McLean saw Walker while she was conducting wellness rounds in October 2014 and told him to submit a health service request form regarding his stomach problems. About a week later, Anderson gave Walker the same instruction when he complained to her during wellness rounds. Edge examined Walker once, on September 30, 2015, offered him Rulox tablets, and placed him on the list to be seen by a physician. Walker contends that the nurses should not have directed him to file health service requests. But the Eighth Amendment does not a give a prisoner a right to treatment on demand. If prison medical staff had a constitutional duty to drop everything whenever a prisoner asked for nonemergency treatment, it is likely that they would not be able to provide effective care for any prisoner. In this instance, the record shows that Walker's complaints to the nurse defendants were about his chronic stomach problems and were not complaints about medical emergencies for which the nurses could have provided him immediate treatment. Therefore, it was reasonable for them to direct Walker to seek treatment in accordance with standard procedures. *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("Delay is not a factor that is either always, or never, significant. Instead, the length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment."). *See also Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016) ("delays are common in the prison setting with limited resources, and whether the length of a delay is tolerable depends on the seriousness of the condition and the ease of providing treatment.").

Walker alleges that the nurse defendants made callous remarks regarding his pain, such as McLean's alleged statement that Walker did not need immediate medical attention if he was "standing [and] breathing," and Anderson's alleged statement, "Don't cry to me. You're not at the Hilton Hotel." But even if I assume that defendants did make these unprofessional

and dismissive remarks, these statements alone are not sufficient to show deliberate indifference to Walker's medical needs. *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000) (verbal harassment or rude comments by prison staff along does not violate the Constitution); *Patton v. Przybylski*, 822 F.2d 697, 700 (7th Cir. 1987) (unprofessional conduct does not violate the Constitution). To prove deliberate indifference, Walker had to submit evidence showing that the nurses' instructions to Walker to seek care from his doctor was "blatantly inappropriate." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). He has failed to do so.

For similar reasons, Walker cannot succeed on his claim that defendant Sherman acted with deliberate indifference to his stomach problems. Walker contends that Sherman acted with deliberate indifference by ignoring his requests for medical assistance on April 4, 2015, when he was vomiting blood. Sherman denies that Walker pressed his emergency call button on that day, but says that if Walker had contacted him, he would have sent another officer to assess Walker and would have directed him to submit a health service request. Even under Walker's version of events, Sherman told him that he would send someone to check on him and another officer then came to his cell to assess him. Walker also concedes that he submitted a health service request that day and was seen by a doctor four days later. No reasonable jury could conclude from this evidence that Sherman was deliberately indifferent to Walker's serious medical needs. Even under Walker's version of events, Sherman responded reasonably to his call by sending an officer to check on Walker and then directing Walker to write to health services to request medical treatment.

This leaves Walker's claim against defendant Cox, the prison physician primarily responsible for treating Walker's H. pylori infection, digestive problems, and reflux during 2014 and 2015. Walker contends that Cox was deliberately indifferent because he "persisted"

14

in ineffective treatment by continuing to prescribe him omeprazole or pantoprazole. Walker believes that these mediations exacerbated his stomach pain, vomiting, constipation, and reflux, ultimately damaging his esophagus. He says that Cox continued to prescribe these medications even though he knew they caused problems for Walker. But Walker has submitted no evidence showing that Cox thought that these medications were causing Walker's problems. Nor has Walker submitted evidence showing that these medications actually did cause any of medical problems. The record shows that even Dr. Yurcek, the outside surgeon who consulted on Walker's treatment, recommended that Walker take omeprazole as late as January 2016.

Moreover, the extensive treatment record recounted above shows that Cox did not disregard Walker's medical needs. Cox ordered that Walker be tested for H. pylori infection and then treated the infection. When Walker's digestive and reflux problems continued, Cox ordered multiple rounds of tests in an attempt to discern the nature of Walker's problems. Cox referred Walker to an outside surgeon, Dr. Yurcek, and followed the recommendations given by Yurcek. Cox continuously modified Walker's medications in attempts to find medications that would provide more relief for Walker. After reviewing the above treatment record, no reasonable jury could conclude that Cox was deliberately indifferent to Walker's medical needs.

In sum, there is no basis to conclude that any defendant acted with deliberate indifference in his or her treatment of Walker's stomach problems. Accordingly, defendants Edge, Lund, Anderson, McLean, Sherman, and Cox are entitled to summary judgment on Walker's Eighth Amendment medical care claims.

**B. Walker's nutritional needs**

Walker was also permitted leave to proceed on a claim that defendants Waterman and Anderson showed deliberate indifference to his nutritional needs by failing to provide him with

15

a bland diet that would improve his medical condition and provide him with adequate nutrition. But the undisputed evidence shows that Waterman and Anderson did not have the authority to approve or deny Walker's request for a bland diet. Only a nurse practitioner or doctor could approve Walker's request for a special medical diet. Waterman and Anderson, along with other nursing staff, responded to Walker's concerns about his diet by providing him with information regarding his diet options, instructing him to avoid eating foods that exacerbated his condition, and telling him that he could ask his treating physician to order a special diet for him.

Even if Walker had shown that Waterman or Anderson had some influence in approving his request for a special diet, Walker has not shown that Waterman or Anderson knew he had a serious medical need for a special diet. Walker says that he needed a "no citrus" and "no spicy" diet because his reflux and stomach problems were exacerbated by spicy and acidic foods. But Walker does not explain clearly why he could not self-select, as Waterman and Anderson directed, and simply avoid eating spicy and citrus foods provided to him. He says that too many foods had spicy or citrus components, but he does not submit any evidence suggesting that if he self-selected he would not have obtained adequate calories or nutrition. He concedes that he gained eight pounds during 2016 and does not suggest that he was suffering from any nutritional deficiencies that would prevent him from self-selection.

In sum, Walker has submitted no evidence from which a reasonable jury could conclude that either Waterman or Anderson was deliberately indifferent to his need for a specific medical diet. Accordingly, Waterman and Anderson are entitled to summary judgment on this claim.

### C. Unsanitary cell conditions

Finally, Walker is proceeding on a claim that defendant Warden Boughton deliberately disregarded the unsanitary cell conditions that likely caused Walker to contract H. pylori. Walker contends that he notified Boughton that the practices for cell cleaning at WSPF caused a serious risk of transfer of H. pylori because inmates are given cleaning rags that are kept in the same bucket as the toilet brushes. But the undisputed evidence refutes Walker's claim. Defendants provide a detailed description of how the cleaning rags and toilet brushes are stored, distributed, removed, and laundered, and Walker has submitted no evidence to refute that description. Therefore, Walker has submitted no evidence to support his claim that the cleaning practices caused unsanitary conditions or led to the spread of H. pylori. Accordingly, Boughton is entitled to summary judgment on this claim.

## ORDER

IT IS ORDERED that:

1. Plaintiff La'mont Walker's motion for summary judgment, Dkt. 84, is DENIED.
2. Plaintiff's motions for a ruling on his pending motions, Dkt. 137, 140, 142, are GRANTED.
3. Defendants' motion for summary judgment, Dkt. 97, is GRANTED.
4. The clerk of court is directed to enter judgment for defendants and close this case.

Entered March 25, 2019.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge